UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KIMBERLY GADDIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No.  4:20 CV 803 CDP |
| | ) |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

Plaintiff Kimberly Gaddis brings this action under 42 U.S.C. § 1383 seeking judicial review of the Commissioner's final decision denying her claim for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  For the reasons that follow, I will affirm the decision.

## Procedural History

On August 23, 2017, the Social Security Administration denied Gaddis's June 2017 application for SSI in which she claimed she became disabled on December 1, 2016, because of a heart condition, attention deficit disorder, and intellectual disability.  A hearing was held before an administrative law judge (ALJ) on February 25, 2019, at which Gaddis and a vocational expert (VE)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration.  She is substituted for former Commissioner Andrew Saul as defendant in this action.  *See* Fed. R. Civ. P. 25(d).

testified.  On April 19, 2019, the ALJ denied Gaddis's claim for benefits, finding that VE testimony supported a conclusion that Gaddis could perform work that exists in significant numbers in the national economy.  On April 22, 2020, the Appeals Council denied Gaddis's request for review of the ALJ's decision.  The ALJ's decision is thus the final decision of the Commissioner.

In this action for judicial review, Gaddis claims that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Specifically, Gaddis argues that in determining Gaddis's residual functional capacity (RFC), the ALJ improperly considered the remote opinion of a non-examining State-agency consultant, improperly evaluated activities of daily living in determining Gaddis's functional abilities, and improperly substituted her own opinion for the medical evidence of record.  Gaddis also contends that the record does not support the ALJ's assessment of her symptoms of attention deficit hyperactivity disorder (ADHD) and treatment therefor.  Gaddis asks that I reverse the ALJ's decision and remand for an award of benefits or for further evaluation.

Because substantial evidence on the record as a whole supports the ALJ's decision, I will affirm the decision.

## Medical Records and Other Evidence Before the ALJ

When Gaddis filed her application for SSI in June 2017, she was twenty-nine years old.  She lived with her mother, one-year-old daughter, and teenaged sister.  She had recently been fired from her job at 7-Eleven after having been

tricked by a customer into loading money onto credit cards.  Before being fired, Gaddis had worked full time at 7-Eleven for nearly one year.

Gaddis received specialized educational services in high school given her 9th grade diagnosis of mental retardation (based on a full-scale IQ of 64) and below-grade-level performance.  (Tr. 682-89.)  In 2012, she graduated with honors from community college with an associate degree in computer information systems.  (Tr. 763.)  Although she was eligible for academic accommodations upon her enrollment in community college, the services expired in 2010.  (Tr. 765.)

Gaddis visited Dr. Michael D. Cooper, a psychiatrist at COMTREA, in March and April 2017 for evaluation of difficulties with concentration and focus, racing thoughts, and memory issues.  Dr. Cooper determined to wait until Gaddis underwent neuropsychological evaluation before prescribing an appropriate treatment regimen.  (Tr. 920-25.)

On April 28, 2017, Gaddis underwent a neuropsychological evaluation to determine her cognitive status.  (Tr. 903-10.)  Gaddis reported to the evaluator that she drives with no problems, pays her bills independently, and performs household tasks independently.  She reported that she was currently going through a divorce after an abusive marriage.  She reported having issues with her concentration, memory, and completing tasks, and that her mother reminds her to take her medications – which at that time were estarylla (birth control) and diltiazem for a heart condition.  She reported that she was misdiagnosed as a child with mental

retardation.  Upon testing, neuropsychologist Lauren Schwarz diagnosed Gaddis with intellectual disability disorder (mild)[2] and ADHD—predominantly inattention subtype.  Dr. Schwarz noted that Gaddis reported some mild symptoms of post-traumatic stress disorder (PTSD) but did not meet the criteria for a PTSD diagnosis.  Dr. Schwarz recommended that Gaddis apply for disability benefits given that her cognitive limitations rendered her unlikely to be gainfully employed.

After receiving the neuropsychological evaluation, Dr. Cooper began treating Gaddis for ADHD.  He prescribed Strattera in May 2017 but discontinued the medication after it caused agitation.  He prescribed Adderall in June 2017, after which Gaddis was able to concentrate and focus more, but she could also feel when the medicine was wearing off.  In response, extended-release Adderall 20mg was prescribed.  When Gaddis reported continued ineffectiveness in August 2017, the dosage increased to 25mg.  Dr. Mirela Marcu at COMTREA increased the dosage to 30mg in January 2018 when Gaddis reported that she had decreased ability to focus and complete tasks and could not figure out some things at work.  Dr. Marcu indicated that Gaddis's intellectual disability may be contributing to her inadequate functioning at work.  In March 2018, Gaddis reported that the increased dosage of Adderall helped, especially when she had several tasks to complete.  She reported, however, that she does not take the medication when she has no tasks to perform.  (Tr. 913-16, 1443-64.)

---

[2] Gaddis obtained a full-scale IQ of 74 with this testing.

In May 2018, Dr. Marcu increased Gaddis's dosage of Adderall to 40mg in response to Gaddis's self-report of being easily distracted and unable to stay on task.  In July 2018, Gaddis reported that she felt better and that the current dosage of Adderall was "very effective" and worked "best for her."  Dr. Mudasir Kamal at COMTREA reported at that time that Gaddis's ADHD symptoms were managed very well on 40mg Adderall.  These same observations were made in September 2018 with notation that Gaddis's current regimen with Adderall was effective with regard to her concentration and energy.  In November 2018, Gaddis reported that she was doing well overall, enjoyed being a mother, and was also taking care of her seventeen-year-old sister.  (Tr. 1465-83.)

Before Gaddis began her treatment with Adderall, her mental status examinations showed speech delay, memory impairment, poor insight and judgment, and tearful presentation.  Beginning in July 2017, however, and continuing throughout the remainder of the treatment record, Gaddis had essentially normal mental status examinations with only mild anxiousness and occasional irritability noted.  Although occasional word-finding difficulties were also noted during this period, Gaddis consistently had fluent language skills, linear thought process, and normal rate and rhythm of speech.

With respect to other medical records and other evidence of record, I adopt Gaddis's recitation of facts set forth in her Statement of Uncontroverted Material Facts (ECF 19-1) as admitted by the Commissioner (ECF 24-1).  This Statement

provides a fair and accurate description of the relevant record before the Court. Additional specific facts are discussed as needed to address the parties' arguments.

## Discussion

A.      Legal Standard

To be eligible for SSI under the Social Security Act, Gaddis must prove that she is disabled. *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner engages in a five-step evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The first three steps involve a determination as to whether the claimant is currently engaged in substantial gainful activity; whether she has a severe impairment; and whether her severe impairment(s) meets or medically equals the severity of a listed impairment. At Step 4 of the process, the

ALJ must assess the claimant's RFC – that is, the most the claimant is able to do despite her physical and mental limitations, *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) – and determine whether the claimant is able to perform her past relevant work. *Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005) (RFC assessment occurs at fourth step of process). If the claimant is unable to perform her past work, the Commissioner continues to Step 5 and determines whether the claimant can perform other work as it exists in significant numbers in the national economy. If so, the claimant is found not disabled, and benefits are denied.

The claimant bears the burden through Step 4 of the analysis. If she meets this burden and shows that she is unable to perform her past relevant work, the burden shifts to the Commissioner at Step 5 to produce evidence demonstrating that the claimant has the RFC to perform other jobs in the national economy that exist in significant numbers and are consistent with her impairments and vocational factors such as age, education, and work experience. *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012). If the claimant has nonexertional limitations, the Commissioner may satisfy her burden at Step 5 through the testimony of a vocational expert. *King v. Astrue*, 564 F.3d 978, 980 (8th Cir. 2009).

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable

person would find it adequate to support the conclusion. *Jones*, 619 F.3d at 968. Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

B.  The ALJ's Decision

The ALJ found that Gaddis had not engaged in substantial gainful activity since her application date for disability. The ALJ found that Gaddis's intellectual disability, PTSD, and ADHD were severe impairments but that they did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 399-400.)[3] The ALJ found that Gaddis had the RFC to perform work at all exertional levels but "must avoid unprotected heights and hazardous machinery. She is limited to jobs that involve simple, routine tasks, not at a production rate (no

---

[3] The ALJ found that several other conditions were either not medically determinable or not severe. (Tr. 399-400.) Gaddis does not challenge these determinations.

assembly line work), with few changes in work setting." (Tr. 402.)  The ALJ determined that Gaddis did not have any past relevant work.  (Tr. 404.)[4]

Considering Gaddis's RFC, age, education, and work experience, the ALJ found vocational expert testimony to support a conclusion that Gaddis could perform work as it exists in significant numbers in the national economy, and specifically, as a cart attendant, auto detailer, and dishwasher.  The ALJ thus found that Gaddis was not under a disability from May 23, 2017,[5] through the date of the decision.  (Tr. 404-05.)

C.     Opinion of State-Agency Consultant

On August 4, 2017, Scott Brandhorst, Psy.D., a non-examining psychological consultant with disability determinations, reviewed the evidence of record and completed a Psychiatric Review Technique Form and Mental RFC Assessment wherein he opined that Gaddis was moderately limited in all domains of mental functioning, that is, understanding, remembering, or applying information; interacting with others; concentration, persistence, or pace; and adapting or managing oneself.  (Tr. 544.)  In her written decision, the ALJ accorded significant weight to that portion of Dr. Brandhorst's opinion addressing Gaddis's moderate limitations in understanding, remembering, or applying

---

[4] Gaddis avers in her brief that although she worked for nearly a year at 7-Eleven, her earnings during that period were less than what is required for the work to be considered substantial gainful activity.  (*See* ECF 19 at p. 4.)

[5] The ALJ considered May 23, 2017, to be the protective filing date of Gaddis's application for benefits.  (*See* Tr. 397.)

information, and in her ability to concentrate, persist, or maintain pace. (Tr. 403.) The ALJ found the opinion only somewhat persuasive with respect to the other domains of functioning, reasoning that Dr. Brandhorst overestimated the limiting effects of Gaddis's conditions and that his finding of moderate limitations in the domains of interacting with others and adapting or managing oneself was inconsistent with the evidence. (*Id.*) The ALJ instead determined that Gaddis was mildly limited in these domains. (*Id.*)

Gaddis contends that the ALJ erred in relying on Dr. Brandhorst's opinion, even in part, given that it was rendered over a year before the administrative hearing and is not consistent with the evidence he reviewed or with the evidence of record as a whole.

"Once the ALJ has decided how much weight to give a medical opinion, the Court's role is limited to reviewing whether substantial evidence supports this determination, not deciding whether the evidence supports the plaintiff's view of the evidence." *Beamer v. Saul*, No. 2:18-CV-00094 JAR, 2020 WL 1511350, at *7 (E.D. Mo. Mar. 30, 2020). *See also Couch v. Berryhill*, No. 2:18 CV 46 DDN, 2019 WL 1992623, at *6 (E.D. Mo. May 6, 2019). While I agree with Gaddis that, generally, an ALJ cannot rely on remote evidence to determine a claimant's abilities, *see Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995), there is no evidence here that Gaddis's condition deteriorated after Dr. Brandhorst rendered his opinion and, indeed, the record shows that Gaddis's mental impairment in fact

improved because of her taking appropriate medication, especially after adjustment to its most effective dosage.  Because there is no evidence that Gaddis's mental impairment deteriorated from the time Dr. Brandhorst rendered his opinion to the time of the hearing, the ALJ could properly consider this opinion evidence in determining disability.  *Beamer*, 2020 WL 1511350, at *9 (citing *Frankl*, 47 F.3d at 937-39).

And contrary to Gaddis's contention, Dr. Brandhorst's opinion of Gaddis's limitations is not inconsistent with the record.  At the time he rendered his opinion in August 2017, the evidence showed that Gaddis had successfully obtained an associate degree with honors; had recently worked full time in a convenience store for nearly one year; obtained a full-scale IQ of 74; and engaged in active and responsible daily activities, such as caring for her one-year-old child, performing household tasks, preparing meals, driving, going out alone, shopping, and taking care of finances.  To the extent Dr. Schwarz's April 2017 neuropsychological evaluation showed impaired memory, poor judgment and insight, and speech delay, Dr. Brandhorst opined that the other evidence of record nevertheless showed Gaddis able to perform simple, routine tasks.  Moreover, as set out above, Gaddis had not yet begun treatment for ADHD when Dr. Schwarz evaluated her, and the record shows that Gaddis's symptoms significantly improved with treatment. Indeed, beginning in July 2017 and continuing through the remainder of the treatment record, Gaddis consistently had normal mental status examinations with

only mild anxiousness and occasional irritability noted. And after Gaddis's dosage of Adderall was adjusted to 40mg in May 2018, she continually reported and her psychiatrists observed that the medication was very effective and worked well, with notable improvement in Gaddis's concentration and energy. Accordingly, at the time of the hearing in February 2019, the record as a whole supported the ALJ's consideration of Dr. Brandhorst's opinion evidence.

It is important to note that the ALJ did not rely on Dr. Brandhorst's opinion exclusively to support her finding of non-disability. A review of the ALJ's decision *in toto* shows that she reached her conclusions after considering and weighing all the relevant evidence of record, as required. When taken together with the record as a whole, a non-examining consultant's medical opinion can be considered when forming the basis of an ALJ's opinion. *See Harvey v. Barnhart,* 368 F.3d 1013, 1016 (8th Cir. 2004) ("[T]he ALJ in this case did not rely solely on [the non-examining consultant's] opinion to reach his conclusions. Rather, the ALJ relied on [the consultant's] opinion as one part of the record, which, as a whole . . . provides substantial support for his findings."); SSR 96-6P, 1996 WL 374180, at *1-3 (Soc. Sec. Admin. July 2, 1996) (an ALJ must treat expert opinion evidence of non-examining providers in conjunction with the other evidence of record).

The ALJ did not err in her consideration of Dr. Brandhorst's opinion in determining whether Gaddis was disabled.

D.     Activities of Daily Living

In determining Gaddis's RFC, the ALJ found that while Gaddis had an intellectual disability, she nevertheless retained the ability to perform simple, routine tasks at a non-production rate in a work setting with few changes.  To support this determination, the ALJ looked to, *inter alia*, Gaddis's daily activities that included caring for her daughter, preparing meals, doing household chores, driving in the community, going shopping, and paying bills.  (Tr. 403.)  Gaddis contends that the ALJ erred in failing to examine the context of these daily activities in determining her ability to perform work, and that Gaddis's description of her daily activities in her Function Report shows that she is unable to function in a work setting.  I disagree.

Contrary to Gaddis's assertion, the ALJ's description of Gaddis's daily activities is consistent with the activities set out in the Function Report, which was completed in June 2017.  The Report shows that Gaddis fully cared for her infant daughter throughout the day with feeding, bathing, diapering, and playing.  Her mother helped with such care when Gaddis had doctors' appointments or was sick.  Gaddis reported that she prepared meals daily, although it took longer because she tried to do too many things at once.  She reported that she did laundry and cleaned daily, but that her mother and sister finished the tasks for her.  She reported having low energy, but that she went out daily and was able to go out alone and drive.  She shopped every few days for groceries, household items, and items for her

daughter. She paid her bills but had difficulty counting money because of ADHD symptoms. She used to cross-stitch as a hobby but no longer had time for the activity and loses focus. She reported that she visited with neighbors and family daily and talked to her grandmother every few days. She had no problem getting along with other people, including authority figures. She reported that she does better with repetitive actions because of difficulty following instructions and not liking change. (Tr. 737-42.) These reported daily activities do not detract from and indeed support the ALJ's determination that Gaddis can perform simple, routine tasks at a non-production rate in a work setting with few changes. *See Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) (claimant's self-reported activities of caring for young son, preparing his meals, doing housework, shopping for groceries, handling money, watching television, and driving a car when necessary showed that claimant could work). This determination is further supported by evidence that once treatment began and was established for Gaddis's ADHD, her energy level and concentration improved, as well as her ability to perform and complete tasks.

The ALJ properly considered Gaddis's daily activities in determining her ability to work. *See Thomas*, 881 F.3d 676 (citing *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937-38 (8th Cir. 2006); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005)). And evidence of record as to the quality of Gaddis's activities and her ability to sustain them over

- 14 -

time supports the ALJ's decision. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). Moreover, the ALJ's determination of Gaddis's RFC was based on more than just Gaddis's daily activities. As noted above, the ALJ reached her decision after considering and weighing all the relevant evidence of record, as required. She discussed specific medical and other evidence of record, addressed the consistency of this evidence when viewed in light of the record as a whole, and assessed Gaddis's RFC based on the relevant, credible evidence of record. *Accord* SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996). She did not err in her consideration of Gaddis's daily activities.

E.  ALJ's Assessment of the Evidence

Finally, Gaddis contends that the ALJ substituted her own opinion for the medical evidence of record and improperly assessed Gaddis's ADHD symptoms and related treatment. Gaddis specifically argues that all of her medical providers have opined that she experiences limitations more severe than those set out in the ALJ's RFC and, further, that the ALJ's statement that Gaddis's doctors have found an effective treatment regimen for her ADHD is not supported by the record.

Other than the opinions rendered by Drs. Schwarz and Brandhorst, the record contains no other medical opinion addressing Gaddis's functional abilities to perform the mental demands of work. *See* 20 C.F.R. § 416.913(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related

limitations or restrictions in the abilities" to perform the physical and mental demands of work activities.).  As set out above, the ALJ properly considered Dr. Brandhorst's opinion.  And she properly found Dr. Schwarz's opinion of cognitive disability not persuasive given that it was internally inconsistent with her own finding that Gaddis's intellectual impairment was mild, and inconsistent with other evidence of record that Gaddis had earned an associate degree in computer skills and worked for a year at 7-Eleven.  *See Goff*, 421 F.3d at 790-91 (inconsistency with other evidence alone is sufficient to discount the opinion of a medical source).  In addition, Dr. Schwarz rendered her opinion in April 2017, well before Gaddis obtained effective treatment for her ADHD.  And, as set out above, upon Gaddis receiving treatment for ADHD, her doctors repeatedly and consistently noted that her mental status examinations were essentially normal, and none of them rendered a medical opinion identifying or setting out the extent to which Gaddis's impairments restricted her from performing work-related activities.  And to the extent the record as a whole showed such limitations, the ALJ properly incorporated them into the RFC.

As to Gaddis's ADHD impairment specifically, the record supports the ALJ's finding that "[a]fter several attempts at determining the correct dose and type of medication, [Gaddis's] doctors have determined the medication that is effective in treating her condition."  (Tr. 403.)  The ALJ recognized, however, that Gaddis continued to experience some limitations with the impairment, as

demonstrated by the inclusion of unskilled work and other restrictions in the RFC. *Id.* The ALJ did not discount Gaddis's ADHD symptoms, as Gaddis alleges, but rather acknowledged that they continued to limit her despite effective treatment.

F.      Evidence Submitted to the Appeals Council

With her request for review of the ALJ's decision, Gaddis submitted additional medical records to the Appeals Council. The Appeals Council did not exhibit the records, finding that they were either not related to the period relevant to the ALJ's decision, or would not change the outcome of the decision. (Tr. 1-6.) I have reviewed these records and agree with the Appeals Council's conclusions.

The records dated August 2017 to January 2019 are mostly duplicative of records that were before the ALJ at the time she rendered her decision and primarily address benign medical issues such as sinus conditions, rashes, and eczema, as well as isolated episodes of dizziness, upper extremity tingling, and shortness of breath. As noted above, Gaddis does not challenge the ALJ's conclusion that none of these physical impairments significantly limits her ability to work. There is no reasonable probability that these records would change the outcome of the ALJ's decision. *See* 20 C.F.R. § 416.1470(a)(5), (b).

The records dated July 24 to November 15, 2019, show newly acquired conditions, including psychosis in July 2019, neuralgia and neuritis in September 2019, and injuries from domestic assault in November 2019. For the Appeals Council to consider this evidence, it must be material and relate to the claimant's

condition for the time period for which benefits were denied, and not to "after-acquired conditions or post-decision deterioration of a pre-existing condition." *Bergmann v. Apfel*, 207 F.3d 1065, 1069-70 (8th Cir. 2000). *See also* 20 C.F.R. § 416.1470(a)(5); *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) (new evidence concerning subsequent deterioration of a previously non-disabling condition is not material). Because the records dated July 2019 and thereafter were not material and the Appeals Council did not consider them in declining review of the ALJ's decision, I need not consider them here to determine whether the ALJ's decision is supported by substantial evidence on the record as a whole. *Cf. Bergmann*, 207 F.3d at 1068 (where Appeals Council considers additional evidence, reviewing court's role is to determine whether ALJ's decision is supported by the record, which now includes new evidence).

## Conclusion

For the reasons set out above on the claims raised on this appeal, a reasonable mind can find the evidence of record sufficient to support the ALJ's determination of non-disability. Because substantial evidence on the record as a whole supports the ALJ's decision, the decision must be affirmed. *Davis v. Apfel,* 239 F.3d 962, 966 (8th Cir. 2001).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and plaintiff Kimberly Gaddis's complaint is dismissed with

prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered herewith.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 14th day of September, 2021.